UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SAMANTHA BOYD,

    Plaintiff,

v.

H&R ACCOUNTS, INC.,

    Defendant.

Case No. 25-12834
Honorable Laurie J. Michelson

---

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISQUALIFY COUNSEL FOR PLAINTIFF [22]**

---

Plaintiff's counsel, Charity Olson, is an experienced consumer protection attorney who has represented numerous debt collection agencies in Michigan. In November 2018, after several years of exclusively defending debt collectors in Fair Debt Collect Practices Act (FDCPA) cases, Olson decided to take on some plaintiffs-side FDCPA matters. This is one of them. Olson represents Samantha Boyd in a suit against H&R Accounts, Inc., a debt collector who Boyd says violated the FDCPA when it sent her a collection notice in an envelope with a transparent window, which revealed that Boyd owed a debt.

H&R is owned by Meduit Group, LLC, an entity that owns many subsidiary debt collection agencies—some of which Olson represented in her many years of FDCPA defense work. While Olson has never represented H&R or Meduit directly, H&R moves to disqualify Olson from the present case, claiming that her long history of representing entities *affiliated with* H&R creates a conflict with H&R itself. For

the reasons that follow, the Court agrees and grants the motion to disqualify (ECF No. 22).

## I. Background

First, some background on H&R, Meduit, Olson, and their tangled history.

### A.

Meduit Group, LLC, founded in 2016, is not a debt collector, but a "revenue cycle management company," whose "business model includes an aggressive effort to purchase debt collection agencies and bring those agencies under the Meduit umbrella." (ECF No. 22-2, PageID.129.) Put simply, Meduit is in the business of buying debt collection agencies. Defendant H&R Accounts, Inc. is one of them. (ECF No. 33, PageID.244.) In April 2021, Meduit acquired H&R. (*Id.*)

Once under the Meduit umbrella, newly acquired collection agencies are typically "merged with a collection agency already under the Meduit umbrella" and undergo a "uniformity" process to ensure their policies and practices conform with those of its parent entity. (*Id.*; *see also* ECF No. 33, PageID.244.) There are three "core collection agencies" under the Meduit umbrella into which most acquired entities are subsumed: CMRE Financial Services, Inc. (CMRE), Receivables Management Partners, LLC (RMP), and H&R—collectively, "Meduit Collection Agencies." (ECF No. 22-2, PageID.129.)



\* Share executives, operational services (accounting, IT, etc.), and some management personnel

Meduit Collection Agencies share a corporate infrastructure virtually indistinguishable from Meduit itself (or from one another). The entities have the same C-Suite, including the same "Chief Executive Officer, President, Chief Financial Officer, Chief Information Officer, Chief of Customer Success Officer, and Chief Sales Officer." (ECF No. 22, PageID.108.)  Meduit and the Meduit Collection Agencies also share "several management positions that are similarly staffed across all entities." (*Id.*) What is more, the entities share internal services for IT, compliance, accounting, and "client services." (*Id.*)

Notably, the entities share one Chief Compliance Officer, Noelle Ten Eyck, and a shared litigation team. (*Id.*) Meduit and its collection agencies retain and assign outside counsel as a group. (ECF No. 22-2, PageID.129 (Declaration of Noelle Ten

3

Eyck).) "In other words, outside counsel is never chosen to work for specifically Meduit or a single Meduit Collection Agency" because, as Meduit explains, "[a]n FDCPA matter in Michigan would be placed with the same counsel regardless of which entity is the defendant under the Meduit umbrella." (*Id.*) As such, Meduit and its core collection agencies—H&R included—"operate in a unified matter in their defense of litigation matters brought by consumers under the FDCPA and similar consumer protection statutes." (*Id.* at PageID.109.)

**B.**

Plaintiff's counsel, Charity Olson, spent much of her career defending debt collectors in FDCPA cases. (*See generally* ECF No. 25-2.) As a law firm associate, she played a significant role in developing the firm's financial services practice. (*Id.* at PageID.174.) Then in 2009, Olson founded her own firm—the Olson Law Group— where, for many years, she "focused exclusively on the defense of individual and class action lawsuits alleging violations of the FDCPA, FCRA, the [TCPA], and similar state laws." (*Id.*) Through her work at Olson Law Group, Olson "eventually represented most of the collection agencies in Michigan." (*Id.*) This included some debt collectors that now fall within the Meduit umbrella—namely, Nationwide Collection Agencies, Inc. (20 cases), Allied Business Services, Inc. (three cases), and Allied Revenue Services, LLC (four cases). (*See, e.g.*, ECF No. 22-3.)

In November 2018, Olson branched out. She founded a separate practice— Olson Litigation, PLC—through which she represents *plaintiffs* in FDCPA cases, while her work through Olson Law Group remains devoted to FDCPA *defense.* (ECF

4

No. 25-2, PageID.175.) This bifurcation of her practice across two separate entities was done, says Olson, "to avoid any perception that [she has] or would use confidential information about corporate clients to benefit [her] consumer clients, and vice versa." (*Id.*)

## C.

That leads to this case. On September 8, 2025, Plaintiff Samantha Boyd, by and through Olson, filed suit against Meduit and H&R, alleging violations of the FDCPA for their attempts to collect a debt using an envelope with a transparent windowpane that reveals the existence of the debt.  (ECF No. 1, PageID.4.) Shortly thereafter, Defendants moved to disqualify Olson from representing Boyd, arguing that Olson's previous representation of various Meduit entities created a "severe and direct conflict" between Olson, H&R, and Meduit. (ECF No. 22, PageID.107.) In their motion, Defendants identified 54 cases in which Olson represented a debt collection agency now held by Meduit. (ECF No. 22-3 (Exhibit B, List of Cases).)

Olson disagrees, arguing that nearly half of these cases occurred before Meduit even existed and thus should be discounted right off the bat. (ECF No. 25, PageID.157–158.) As to the remaining 29 cases, Olson points out that these cases mostly occurred before her clients—Nationwide and Allied—were acquired by Meduit. (*Id.* at PageID.158.) She does, however, acknowledge her long-standing relationship with Nationwide Collection Agencies, which merged with RMP, one of Meduit's "core 3" debt collectors alongside H&R, in 2018. (*Id.* at PageID.159.) On two occasions after this merger, Olson represented Nationwide-turned-RMP in two

FDCPA matters. (*See, e.g.*, ECF No. 22-3.) In so doing, Olson communicated directly with Meduit and Meduit Collection Agencies' Chief Compliance Officer, Noelle Ten Eyck, who also serves as Chief Compliance Officer of H&R. (*See* ECF No. 22-4 (email thread showing communications between Olson and Ten Eyck during Olson's representation of RMP).)

Nevertheless, Olson challenges the premise that representation of entities *affiliated with* H&R creates a conflict of interest with H&R itself. (ECF No. 25, PageID.157.) As for the two cases in which she directly represented a Meduit entity *after* it had been acquired by Meduit (the RMP cases), the matters were short-lived and are now several years old, which Olson says further mitigates the risk that she obtained confidential information of benefit to Boyd. (*See* ECF No. 25-2, PageID.179.)

The Court conducted a hearing on the motion to disqualify on February 25, 2026. (Minute Entry, February 25, 2026.) Shortly thereafter, the parties stipulated to dismiss Meduit from the case. (ECF No. 32.) But there remains a dispute as to whether a conflict exists between Olson and H&R. To that end, the parties provided supplemental briefing on the nature and extent of Olson's interactions with Meduit entities. (ECF Nos. 33, 34, 36.)

## II. Analysis

Michigan lawyers owe a duty of loyalty and confidentiality to their clients. Michigan Rules of Professional Conduct 1.6, 1.7. This duty does not dissolve once a particular representation ends. Rather, "[i]t is . . . well accepted that the duty of loyalty to the client survives termination of the relationship." Michigan Prof'l &

Judicial Ethics Comm., Informal Op. RI-46 (1990) (citations omitted). As such, Michigan's Rules of Professional Conduct provide that:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation.

Michigan Rule of Professional Conduct 1.9(a); *see also* American Bar Association Model Rule 1.9.

Lawyers have a duty to refuse representation where they believe it would violate their ethical obligations. *See id.* But where a lawyer has failed to do so, courts have "inherent authority" to disqualify them from representation, *Michalak v. Shanti*, No. 25-11257, 2025 U.S. Dist. LEXIS 213486, at *3 (E.D. Mich. Oct. 29, 2025) (quoting *D.H. Overmyer Co., Inc. v. Robson*, 750 F.2d 31, 33 (6th Cir. 1984)), or a party may seek disqualification by motion. *See Glenn v. Nasscond, Inc.*, No. 15-10270, 2016 U.S. Dist. LEXIS 13068, at *4 (E.D. Mich. Feb. 3, 2016).

The Sixth Circuit employs a three-part test (the "*Dana*" analysis) to assess whether disqualification of an attorney is warranted. *Dana Corp. v. Blue Cross & Blue Shield Mut. Of N. Ohio*, 900 F.2d 882, 889 (6th Cir. 1990). This test asks whether (1) a past attorney-client relationship existed between the party seeking disqualification and the lawyer; (2) the subject matter of the prior relationship is substantially related to the new matter; and (3) the lawyer received confidential information from the party seeking disqualification. *Bowers v. Ophthalmology Grp.*, 733 F.3d 647, 651 (6th Cir. 2013) *(quoting Dana Corp.*, 900 F.2d at 889).

7

The Court undertakes this analysis bearing in mind that disqualification is a drastic measure. Courts confronting a potential conflict must carefully weigh the "competing public policy interests of preserving client confidences and permitting a party to retain counsel of his choice." *Manning v. Waring, Cox, James, Sklar & Allen*, 849 F.2d 222, 224 (6th Cir. 1988), Because motions to disqualify may be used as a "technique of harassment" and thus can become a "potent weapon" to undermine a plaintiff's case, "[c]ourts must be vigilant in reviewing motions to disqualify counsel.'" *Moses v. Sterling Com. Am. Inc.*, 122 F. App'x 177, 183 (6th Cir. 2005). Accordingly, the party seeking disqualification bears a heavy burden. *See Doe v. Romulus Cmty Sch. Dist.*, 2026 U.S. Dist. LEXIS 8272, at *4 (E.D. Mich. Jan. 15, 2026).

## A. Attorney-Client Relationship

Beginning with the "threshold matter" of whether a past attorney-client relationship exists between H&R and Olson, *Burdow v. State Farm Fire & Cas. Co.*, 2014 U.S. Dist. LEXIS 205448, at *5 (W.D. Tenn. Mar. 19, 2024), the parties do not dispute that Olson had such a relationship with debt collectors now under the Meduit umbrella. But they do dispute the extent to which Olson's previous representation of non-defendant Meduit subsidiaries and affiliates can be imputed to defendant H&R. So while the first question of the *Dana* analysis appears simple—whether Olson and H&R have a past attorney-client relationship—it betrays an easy answer.

### 1. Legal Standard

It is helpful to first consider some general principles underlying the definition of an attorney-client relationship. "[C]reation of an attorney-client relationship is not

8

dependent upon payment of fee or formal contract, but rather may be implied from the conduct of the parties." *Quicken Loans v. Jolly*, No. 07-13143, 2008 U.S. Dist. LEXIS 48266, at *7 (E.D. Mich. June 24, 2008). In the absence of a formal or written agreement, courts in this Circuit generally apply a two prong-test for evaluating whether a former attorney-client relationship exists: 1) Did the supposed client submit confidential information to the lawyer? and, 2) If so, did they do this with the "reasonable belief" that the lawyer was acting as their attorney? *See, e.g.*, *Bartech Indus. v. International Baking Co.*, 910 F. Supp. 388, 393 (E.D. Tenn. 1996).

That standard test, however, is not particularly helpful in cases like this one, where the conflict exists in the context of "national or multi-national public corporations owning or partially owning subsidiaries" that, while legally distinct, may be fairly considered "one" entity for the purposes of attorney-client protections. *Ramada Franchise Sys. v. Hotel of Gainesville Assocs.*, 988 F. Supp. 1460, 1463 (N.D. Ga. 1997). That is, where the entity seeking disqualification was never directly represented by the supposedly conflicted lawyer, but that lawyer represented an *affiliate* of that entity, the court must first struggle with whether the affiliated entities may be fairly considered "one" client.

In these cases, often referred to as "corporate affiliate conflicts," many courts have followed a path laid by the Second Circuit. *Gracey Gen. P'ship v. City of Clarksville*, No. 23-01189, 2024 U.S. Dist. LEXIS 130857, at *19 (M.D. Tenn. July 24, 2024) ("Many courts . . . have held that an affiliated entity of an entity that was previously represented by an attorney may 'also be considered a 'client' for

9

disqualification purposes.'") (collecting cases). This approach encourages courts to ask not whether the relationship is "in all respects that of attorney-client," but to evaluate, more broadly, "whether there exist sufficient aspects of an attorney-client relationship 'for the purpose of triggering inquiry into the potential conflict.'" *Glueck v. Jonathan Logan, Inc.,* 653 F.2d 746, 749 (2d Cir. 1981) (citations omitted).

The Court finds, as many others have, that the affiliate-conflict approach as refined by the Second Circuit is the more appropriate test in a case like this. *See, e.g.,* *Std. Ret. Servs., Inc. v. Kentucky Bancshares, Inc.*, No. 14-026, 2014 WL 4783016, at *6 (E.D. Ky. Sept. 24, 2014) (denying disqualification where the movant provided no evidence of a "connection" between the two affiliated entities "beyond their common ownership"); *see also Warner Chilcott Co. v. Watson Pharms., Inc.*, No. 06-3491, 2008 U.S. Dist. LEXIS 130533, at *9 (D. N.J. Jan. 2, 2008) ("Defendants' formalistic reading of the attorney-client relationship, as applied to a motion to disqualify, is not the law and does not govern this analysis. . . . [T]he court should not look at whether the relationship at issue is 'in all respects that of attorney and client, but whether there exists sufficient aspects of an attorney-client relationship for purposes of triggering inquiry into the potential conflict.'") (quoting *Ramada*, 988 F. at 1463).

So, in analyzing whether a former attorney-client relationship existed here for prong one of the *Dana* analysis, the Court looks not for the formal trappings of an attorney client-relationship between Olson and H&R, but considers whether "the circumstances are such that . . . an affiliated entity [H&R] of an entity that was previously represented by an attorney [other Meduit subsidiaries] may 'also be

10

considered a 'client' for disqualification purposes.'" *Gracey Gen. P'ship*, 2024 U.S. Dist. LEXIS 130857, at *18.

## 2. Analysis

The Second Circuit has identified two factors to evaluate in determining whether a corporate-affiliate conflict exists: (1) the "degree of operational commonality between affiliated entities," and (2) "the extent to which one depends financially on the other." *See GSI Commerce Solutions, Inc. v. BabyCenter, LLC*, 618 F.3d 204, 210–11 (2d Cir. 2010) (citations omitted). "Operational commonality" includes the extent to which entities rely on a "common infrastructure," "common personnel such as managers, officers, and directors," and "shared or dependent control over legal and management issues." *Id.*

The parties first quibble over which H&R affiliates, if any, are relevant to the Court's analysis. Although they dispute whether Olson's representation of some Meduit affiliates *before* their joining with Meduit should be considered, there is no dispute that Olson represented RMP, under the Meduit umbrella, in 2018. (ECF No. 25-2, PageID.178–179.) And while Olson emphasizes the brief and limited nature of her relationship with RMP itself, recall that in January 2018, RMP merged with Nationwide, a long-time client of Olson's. (*Id.*)

The end of Nationwide as an independent entity did not mean the end of its relationship with Olson. Just two months after its merger with Nationwide, in March 2018, Olson represented RMP as the surviving entity. (*Id.* at PageID.179.) She did so again in April 2018. (*Id.*) So while Olson may have only represented RMP twice, she

11

represented one of its predecessors, Nationwide, in 20 identified cases, most of which occurred less than a year before Nationwide and RMP's merger. (*See, e.g.*, ECF No. 25, PageID.158.)[1] And, Olson admits that at *some* point prior to Nationwide and RMP's official merger, she provided "litigation updates" to RMP at Nationwide's request. (ECF No. 25-2, PageID.178.) Thus, "as a practical matter," Olson's relationship with RMP is more significant than a mere two cases. *See M-I LLC v. Stelly*, No. 09-1552, 2010 U.S. Dist. LEXIS 52736 at *8 (S.D. Tex. May 26, 2010) (reasoning, on a motion to disqualify, that following a merger, as a "practical matter," the "attorney-client privilege with respect to any confidential communications between [defendant law firm] and corporate actors of [the predecessor corporation] concerning these operations passed to the management of [the new company].") (alternations in original).

Moreover, the degree of "operational commonality" between H&R and RMP is significant. H&R and RMP, as sister subsidiaries under the Meduit Group, share virtually identical operations. Like all the core Meduit Collection Agencies, H&R and RMP operate in a "unified manner"—sharing the same C-Suite, some management

---

[1] Olson also represented Meduit subsidiary Allied Revenue Services, LLC four times, and represented a predecessor of Allied Revenue Services, Allied *Business* Services, three times (*See id.*). But neither party identifies when Allied Revenue Services was acquired by Meduit Group or when Olson's representation of Allied ended. Nor is it clear from Defendants' briefing that Allied Revenue Services, which apparently sits outside of Meduit Collection Agencies, shares the same operational uniformity that the three core agencies (RMP, H&R, and CMRE) share. So the Court does not analyze Allied as an affiliate entity for the first prong of the *Dana* analysis but notes that there is even more potential overlap between Olson and the mountain of Meduit affiliates that has not been thoroughly excavated.

personnel, and operational services like HR and IT. (ECF No. 22-2, PageID.129.) Importantly, H&R and RMP share the same Chief Compliance Officer and legal team. (*Id.*) Indeed, when Olson represented RMP, her direct point of contact was Ten Eyck, Chief Compliance Officer of both H&R and Meduit. (*Id.*)

Although the record contains nothing to establish financial interdependence between the parties, it does show that the parties hire and assign outside counsel as one. (*Id.*) So, at the very least, the Court can glean that H&R, RMP, and Meduit share the same bill for outside legal services.

Accordingly, considering these circumstances, the Court finds that Meduit and Meduit Collection Agencies, which includes both H&R and RMP, may be fairly considered "one client" for the purposes of attorney disqualification. As such, prong one of the *Dana* analysis is met.

## B. Substantially Related Matters

The second prong of the *Dana* analysis focuses on the content of the attorney's representation. A party seeking disqualification must show that "the matters embraced within the pending suit are substantially related to the matters or causes of action wherein the attorney previously represented [the former client]." *Kirsch v. Dean*, 2017 U.S. App. LEXIS 21257, at *3–4 (6th Cir. 2017) (citation omitted).

Matters are substantially related where the cases involve the same transaction or legal dispute, or where "there is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." *Bowers v.*

*Ophthalmology Group,* 733 F.3d 647, 652 (6th Cir. 2013) (quoting Ky. S. Ct. R. 3.130 (1.9 cmt. 3).)

The parties devote little time to this prong of the *Dana* analysis, likely because it overlaps with the more challenging third prong and is otherwise easily met: Both of Olson's cases with RMP involved FDCPA claims arising from its debt collection practices. (ECF No. 25, PageID.160–161.) Similarly, the present case is an FDCPA litigation arising from H&R's debt collection practices. While Olson points to the factual distinctions between those cases and this one, that hair-splitting approach has been rejected by the Sixth Circuit. *GE Co. v. Valeron Corp.*, 608 F.2d 265, 267 (6th Cir. 1979) ("Valeron argues that . . . [GE must] show a substantial relation between Cantor's work for it and the actual Issues of the present lawsuit . . . this narrower formulation is not supported by case law").

Because the nature of the claim is such that the "subject matter of the litigation is substantially related to the work [Olson] did for [RMP]"—that is, evaluating the collectors' debt collection practices—the Court finds prong two of the *Dana* analysis met. *See id.* (citing *Melamed v. ITT Continental Baking Co.*, 592 F.2d 290 (6th Cir. 1979).)

### C. Confidential Information

Lastly, the third element of the *Dana* test requires the Court to determine whether Olson acquired confidential information from H&R's affiliate entities. *Dana Corp.,* 900 F.2d at 889. As another court recently explained, resolution of this element "can be tricky because the movant 'need not specify the content of the confidential

information that was revealed' in the matter in which the opposing counsel previously represented them. Instead, district courts 'must review the confidential information inquiry from cruising altitude, 'using generalities,' rather than 'examining what actually happened.''" *Doe*, 2026 U.S. Dist. LEXIS 8272 at *12 (citations omitted). While this analysis overlaps with the "substantially related" analysis above, it is not coterminous. *See Harvey v. United States*, 798 Fed. Appx. 879, 885 (6th Cir. 2020). That is, the Court cannot, as Defendant argues (ECF No. 22, PageID.121), presume confidential information was obtained by virtue of finding the matters substantially related under *Bowers*. *Id.*

Defendants' arguments regarding Olson's receipt of confidential information may be broken down into two: First, they claim that Olson's long history of defending Meduit affiliates in FDCPA cases would have familiarized her with the entities' confidential debt collection policies and procedures. (ECF No. 33, PageID.246.) Second, and more broadly, Defendants say that Olson, as a "trusted legal advisor of Meduit and Meduit Collection Agencies" obtained confidential information regarding the entities' general approach to litigation and defensive strategies, including: "litigation and settlement strategies, risk-avoidance protocols, overall FDCPA compliance, and collection practices and strategies." (*Id.* at PageID.247.) Olson disputes both.

First, Olson contends that any familiarity she had with Meduit Collection Agencies' confidential policies and procedures does not, or would not, translate into familiarity with H&R's procedures. (*See, e.g.*, ECF No. 34, PageID.259.) Because she

15

has never represented H&R directly, says Olson, she has never seen H&R's confidential policies, and any potential similarities between H&R's policies and those of its sister entities once represented by Olson are mere "coinciden[ce]." (ECF No. 34, PageID.259.)

But Defendant shows otherwise. In its supplemental brief, H&R explains that *every* entity acquired by Meduit goes through a "Transition and Uniformity Project" to ensure the new agency's policies are "brought into alignment" with Meduit's. (ECF No. 33, PageID.244–245.) And, according to a declaration from Meduit's Vice President of Operations, Eric Coats, during H&R's Transition and Uniformity project, "it was determined H&R's written policies and procedures were already in substantial uniformity with expectations for the policies and procedures within the Meduit Group, LLC family of agencies." (ECF No. 33-1, PageID.253.) So whether the policies Olson reviewed for RMP bore an RMP "logo" or an H&R logo is immaterial (ECF No. 34, PageID.258); the substance of the documents was, by design, the same. (ECF No. 33-1, PageID.253) ("[E]ven if Ms. Olson has never seen the policies and procedures at issue, [H&R's] policies and procedures are substantially similar to the policies and procedures held throughout the Meduit Group, LLC family of agencies which Ms. Olson represented.").)

In the alternative, Olson says that even if H&R's confidential debt collection policies and procedures were at one time identical to those she defended in cases past, enough time has passed such that the policies she knew are no more. (ECF No. 37, PageID.291.) She points out that in 2020, the Consumer Financial Protection Bureau

16

rolled out "significant and permanent changes" to the FDCPA that would require Defendants "and every other debt collector subject to the FDCPA" to change their policies and procedures. (ECF No. 25, PageID.167.) But Ten Eyck says otherwise:

> The substance and core of the entities Ms. Olson represented are the same substance and core she now sues against on behalf of Plaintiff and the proposed class. The actual debt collection operations at issue *have not substantively changed*. Moreover, the C-Suite did not change, the lead Compliance Officer and Legal Team did not change, the services for IT, compliance, accounting, and client services did not change. The only change that occurred is the name of the entities in question.

(ECF No. 22-2, PageID.130. (emphasis added)). The Court understands that Olson finds this claim untenable. (ECF No. 25, PageID.167; ECF No. 37, PageID.291 (characterizing Meduit's claim of unchanging practices "dubious" and "intellectually dishonest"). As an exhibit, she provides a Meduit newsletter reporting that Meduit implemented changes to its "debt collection activities" to comply with these regulations. (ECF No. 25-2, PageID.190.) But two things can be true. Meduit may have implemented changes in 2021, but those changes may not have been so "substantive" as to render the policies and procedures unrecognizable to Olson.

Even if Ten Eyck's sworn declaration is inaccurate and the debt collection policies and procedures Defendants' use today are unrecognizable from those Olson once defended, this does not address Defendants' second, more generalized concern: "the crux of the conflict of interest arises here from the intimate, nearly decade-long relationship between Ms. Olson and Defendants." (ECF No. 27, PageID.230.) Setting aside the specifics of Olson's representation of H&R affiliates in each case, Olson dismisses this argument as too broad and otherwise inapt, asserting that the

17

litigation strategies she used were hers alone and based on her ample experience in FDCPA matters. (ECF No. 34, PageID.256.)

That may be. But litigation does not happen in a vacuum. Even assuming Olson was the primary or even sole architect crafting an individualized litigation plan for each case she handled, Ten Eyck explains that she, her litigation team, and outside counsel "regularly discuss the collection practices and strategies for all entities interchangeably," and that this natural collaboration "simply cannot be avoided, given the unified nature of Meduit" and its affiliates. (ECF No. 22-2, PageID.130.) Having worked with Ten Eyck, Olson would know this, and thus would also know that strategies and approaches *she developed* may very well still be in use throughout Meduit's entities. As another court in this District put it:

> Despite the parties' different characterizations of the scope of the work . . . performed and the kind of information [the conflicted law firm] was privy to in its prior representation . . . this much is clear: [the firm] performed a range of legal services for [the former client] over an 11-month period. And through that work [it] had access to a wealth of information about [the former client] and [and an employee of the former client] that it would not have otherwise had, but for the attorney-client relationship.

*Doe*, 2026 U.S. Dist. LEXIS 8272 at *9.

In sum, this much is clear: For many years, Olson represented Nationwide in twenty discrete cases. Shortly after Nationwide merged with RMP, Olson continued her relationship with the group, representing RMP in two subsequent matters, before starting a plaintiff-side FDCPA practice just a few months later. In her work with Nationwide-turned-RMP, Olson had access to confidential information concerning how the entity collected debts, developed policies and procedures, and generally

approached consumer litigation. This confidential information, belonging to Nationwide-turned-RMP, is necessarily shared with H&R, which came under the Meduit umbrella in 2021 and joined its "unified litigation" approach. While Olson disputes significant aspects of H&R's claims, this narrative is corroborated by Olson's emails with Ten Eyck, Ten Eyck's declaration, and Coats' declaration.

As such, there is a significant and tangible risk that the very strategic wisdom Olson implemented at RMP is in use at H&R today and gives Olson a material advantage in representing Boyd in a suit against it. For these reasons, the Court must find that Olson has an actual conflict that disqualifies her from representing the Plaintiffs in the present case.

## III.

One final note. The Court does not believe Olson has, or ever would, trade confidential information among her various clients. The Court takes no pleasure in disqualifying an attorney that it knows zealously and effectively represents both her consumer and corporate clients. But for the reasons provided above, the Court finds that no amount of effective and careful lawyering can obviate the conflict concerns raised in this case.

For the reasons provided above, Defendants' motion to disqualify Olson is GRANTED, and Plaintiff's motion to seal exhibits (ECF No. 35) is GRANTED.

Dated: April 17, 2026

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

19